Good morning, Your Honor. I'm Beth Spruer, and I'm here on behalf of the appellant, Mr. Jason Hutton. Mr. Hutton is before this court because he's appealing Social Security's denial of his Social Security benefits. On appeal, he's raised three specific non-severe impairments at Step 2 of the sequential evaluation. Mr. Jason also asserts that the ALJ erred. Mr. Hutton, I'm sorry, Jason Hutton, yes. Mr. Hutton also asserts that the ALJ erred in discrediting or not crediting the treating opinion evidence of his VA psychiatrist, his VA psychologist, and the VA's determination that Mr. Hutton was 100% disabled based specifically on his PTSD and depression. Third, Mr. Hutton asserts that the ALJ erred in his mishandling of the third-party evidence. The fact that he omitted critical portions of Mr. Hutton's wife's third-party statement and the fact that he failed to even reference the statement of his school counselor. I think I've briefed those issues. However, what I'd like to do is address three issues that are still ñ that need to be flushed out a little bit more. First, I'd like to refute the appellee's contention that Dr. Gregg's non-examining opinion constituted substantial evidence and that the ALJ was justified in relying upon that opinion to find Mr. Hutton's PTSD and depression non-severe at Step 2 of the sequential evaluation. At the outset, it should be mentioned that at Step 2, a finding of non-severe is very unusual because Step 2 is a de minimis standard. It's a very easy threshold. And as I said, a Step 2 finding of non-severe, especially in this case, is quite unusual. But what relevance does that have if they go all the way to Step 5, not to consider the PTSD and the depression as, quote, severe impairment, unquote, when it is considered at Step 5? Well, it's ñ I think what it does is it casts the whole discussion into a different ñ into a different category. If you ñ if the ñ if the ALJ goes throughout the entire hearing and has found the depression and PTSD to be non-severe, then he really, even though he claims to have, you know, considered it, and his decision does consider these issues, it's still a finding that if he's made that founding, then his decision is still a non-severe impairment. I actually couldn't tell exactly what he did with the PTSD. At the end, when he tries to get the vocational person to give an opinion, he says something about psychological problems in the hypothetical. I don't know if that was intended. I think ñ and he said about the inability to work. And then the ñ and so then what does the ALJ do with that? Well, the ALJ basically disregarded, number one, that testimony because the ALJ found in his decision that the impairment was non-severe and didn't include any of the limitations assessed by his treating psychologist, psychiatrist, or the VA. So what happens? He gets to Step 5, puts in the PTSD, and then the hypothetical that has the PTSD in it is disregarded because of what he did at Step 5. Is it Step 2? Is that how ñ Well, it's at Step 2 and 3 and 4. He even ñ okay, let's say he got beyond Step 2, and he was evaluating the actual opinions of the treating psychiatrist, psychologist, and the VA. He rejected all three of those opinions in favor of Dr. Gregg's non-treating opinion. So the ALJ has a non-examining opinion, which in the hierarchy of physician evidence, at least in this circuit, is upside down. Generally, the opinions of a treating physician are given greater weight unless the ALJ has legitimate reasons, articulates legitimate reasons for rejecting them, which in this case the ALJ did not. I'm sorry. Well, no, I'm ñ no, fine. That's your answer to that question. I had another question, which was ñ I didn't get quite the answer to Judge Rustani's question. All right. Okay. And let's go over that. In the second hypothetical, the ALJ added, this person is going to be further restricted in that they ñ he meant he, but people make that error all the time ñ in that they will be unable to make a decision. They will be unable to perform work on a full-time basis for a variety of physical and psychological reasons. They would be missing two or more days a month, more than that employer would normally allow. Could this person maintain competitive employment? Answer, no. Correct. So the failure to categorize PTSD and depression as severe impairment did not bar the ALJ from putting the question to the expert witness to consider the psychological reasons. I'm having difficulty understanding why an error at step two had any prejudicial effect at step five. Given the question ñ Given the question ñ given the hypothetical and given the fact that the ALJ did include it, I ñ I'm going to concede that point. I'm going to say it didn't have prejudicial impact to the extent that he did proffer ñ I mean, he did proffer the hypothetical. The hypothetical was answered. He just ñ he just didn't accept that evidence. The hypothetical was answered in a way which made him disabled. Absolutely. But the reason that he ñ  Well, it was that error, but the error begins before he got to the hypothetical. The error occurred when he, one, decided to discredit the opinions of the treating psychiatrist, treating psychologist, and the VA administration's finding 100 percent disability. Regardless of whether he included ñ he included ñ he included some of those findings in the hypothetical, but then completely rejected the V.E.'s testimony because he rejected the underlying evidence upon which the V.E. testified. I mean, you know, he ñ in other words ñ The error is at step five. Well, I guess it's at step five. You could say it was at step five in finding ñ in ignoring or in rejecting the V.E.'s testimony based on the evidence that was adduced at steps two, three, and four. But you just told me that was not error in ñ Well, three and four. In other words, the error ñ I didn't mean to say it was an error to follow the V.E. That's ñ I ñ if I said that I have ñ that was a misstatement. I did not ñ I do not mean that. No. The ALJ absolutely erred at step five when he disregarded the V.E.'s testimony in his final findings. However, the crux of the case is ñ lies elsewhere. It lies ñ it comes before that. In other words, the ALJ erred when he evaluated the evidence, when he evaluated and in the weight he accorded the treating ñ treating psychologist, treating ñ you know, all the treating opinions, the VA evidence. There ñ that was his error in rejecting that evidence in favor of the opinion of a non-examining of ñ reviewing physician who never even saw Mr. Hutton. That was his essential error. You want us to hold that it's error for the ALJ to choose the non-examining and non-treating physicians in favor of the V.E. determination, as opposed to what a Veterans Administration psychologist, a VA psychiatrist, or a VA rating holds? Yes. I mean, essentially what I'm asking ñ Don't they have different standards? Pardon me? Don't they have different standards? Well, then ñ The VA has different standards. Well, in McCarty, the court held that ñ that the ALJ should accord great weight to the finding of the VA unless he offers persuasive and legitimate reasons for not doing so. And here we don't have that. But just a second. I thought these VA doctors didn't have comprehensive notes explaining why they came to these ñ one of them didn't even have any notes at all, right? There ñ he didn't ñ they didn't have any notes. However, there were references to the fact that he had prescribed psychotropic medications. There was reference to the fact that he was a treating provider. And in order to prescribe medicine, he obviously had to see the patient. There were also treatment notes from Dr. Mack. And there were also treatment notes generally from the VA that covered his PTSD and depression. Also, in addition, the VA made a special ñ conducted a special PTSD evaluation in connection with the disability rating and reviewed numerous records, secondary records, including his entire military record, his employment record, the entire treatment record in making their final determination that he was 100% disabled based on his PTSD and depression. So there was definitely evidence in the record which supported the findings of the physicians. However, if the ALJ ñ you know, and he said he did. He had concerns about it. He said, well, there are no treatment records. Well, you know, they're confusing ñ with respect to Dr. Mack, he said they were confusing. With respect to Dr. Livias, he said they were nonexistent, which wasn't exactly true. But if that was the case, and they both ñ they had both given and offered their opinions, then it was up to the ALJ, and the law provides for it, to recontact those physicians and ask for clarification. I mean, physicians just don't routinely lie or come up with residual functional capacity statements out of the blue that it is a basis for those statements. The record contained record ñ I mean, underlying treatment records of Mr. Hutton's PTSD and depression. And there was absolutely a basis for the finding, in the record itself, of PTSD and ñ I was a little confused about the PTSD, as to when the claim of PTSD arose. I think that bothered the ALJ. He said it didn't come up until 2007 when he started this. I thought it came up a little earlier. It came up actually ñ my first notice of it was in 2006. And I think the record confirms that. It also ñ As a result of what life-threatening incident? Well, actually, it was ñ the Veterans Administration found that it was service-related. And I think his ñ we should also look at the ñ you can also look at the third-party statement of his ñ Wife? His wife, yes, and also his ñ Let me ask you again. My understanding is that post-traumatic stress disorder requires for the diagnosis a life-threatening incident, either a physical trauma or some other unsettling event. What is the claim here? Well, the claim that Mr. ñ And was he in battle? Yes, he was in battle. I mean, he was in, I guess, Iraq or ñ Iran? Iraq, yeah. It would have been Desert Storm, I think. And his counselor ñ his school counselor indicated that these memories were triggered and were brought to the fore when he ñ when it was discussed in a class he was taking. And thereafter, the counselor reported that ñ and I'm going to quote from him because I think it's important. Running out of time. Okay. And the counselor indicated that because of that, after that occurrence, that Mr. Hutton began to withdraw from people and his grades went down. So I think, you know, you have the event in the initial event of the war, and you have a lot of memories. His wife also indicated that he suffered from PTSD and nightmares and had difficulty sleeping because of the war. She said that in her third-party statement. Thank you very much. Yes. Could I ask a question? I've understood everything you've said. I take it you are not asserting before this Court that somehow his weight situation ñ No. No. No. Let me ask the question before you answer it. All right. That the weight situation in any way is involved in this case. No, Your Honor. You're not? No. Okay. No, I'm not, Your Honor. I'm out of time. Just two minutes for rebuttal. Okay. Thank you, Your Honor. Good morning. Paul Saccolari for Michael J. Estrue, Commissioner of Social Security. Tell me, would you please counsel, Mr. Saccolari, how you get around the fact that the ALJ asked the right question in the second hypothetical, putting not only the variety of physical reasons but also psychological reasons and concluding that they would, all those reasons together, would cause him to miss two or more days a month, more than an employer would normally allow, and ask the vocational expert, could that person maintain competitive employment, to which the expert responded, no. How is that consistent with the determination that he's not disabled from work? Well, at the time of the hearing, the ALJ has not made a determination about the claimant's residual functional capacity. So routinely at the hearing, the ALJ will ask several hypothetical questions to a vocational expert that cover a broad range of possible functional limitations so that he can have it on the record when the ALJ ultimately does make their finding regarding the claimant's residual functional capacity that they can then have a basis upon which to make their Step 5 findings. So he asks the question about which, at least in broad terms, includes PTSD, but then he disregards that answer because at an earlier step he decides that there is no severe PTSD. That's correct. Okay. So it's really Step 2 we have to go back to because that determines everything. Well, not necessarily. At Step 2, the ALJ determines what impairments are severe per the regulations. Severe impairments can cause functional limitations. Non-severe impairments can also cause functional limitations when taken together with severe impairments. Exactly. At Step 2, did the ALJ consider not only the physical limitations but also the psychological limitations in cumulative fashion and determine that together they were not severe, or did he simply say that the psychological factors were not severe? The ALJ, the claimant passed the Step 2 threshold. The ALJ found that the claimant did have severe impairments. But only as to the physical. That's correct, physical impairments. He did not pronounce himself as to whether he had severe impairments when one added the physical to the psychological impairments. Correct? The ALJ did not find that he had psychological impairments at Step 2. I guess I didn't ask my question correctly. Perhaps I misunderstood your question. He found that he had PTSD and depression, but they were slight. Yes, that they were not severe. But what he didn't do was put them together with the physical impairments and say these physical impairments being severe and these psychological impairments being slight. I now add the psychological to the physical impairments and determine that their combination is, fill in the line, slight or severe. Well, what the ALJ did is at the residual functional capacity portion of his decision, ALJ then weighs all of the physical and mental impairments, both severe and non-severe, in order to come up with a residual functional capacity. And at that stage, ALJ did find that Mr. Hutton was limited to simple, repetitive, non-public work, which is, in effect, a mental limitation. But as to the hypothetically asked VE at ER 60, which I've read a couple of times, doesn't that indicate just the opposite, that he can't do that kind of work? Well, if the claimant had those functional limitations, as outlined in that hypothetical, as the VE said, no. But the ALJ ultimately did not find that Mr. Hutton had those functional limitations. But he did find that he had PTSD and depression, but they were slight. Ultimately, it's... And he didn't say perform work on a full-time basis for a variety of physical and slight psychological reasons. He just said, and psychological reasons. So why do you say that he maintained in his Step 5 questioning that the PTSD and depression were slight? I guess the point is that there is a distinction between a diagnosis of an impairment and the functional limitation that results from that diagnosed impairment. And so at the residual functional capacity stage, ALJ looks at the various diagnoses that a claimant may have, and through looking at the medical evidence, determines the severity of the functional limitation that results from those impairments. And what the ALJ did in this case is looked at all of his impairments, found a functional limitation, and with that functional limitation found ultimately at Step 5 that there was work that the claimant could do with that functional limitation. Notwithstanding the answer which the V.E. gave him to a question which involved both physical and psychological reasons. Well, that was not the only question that was asked of the vocational expert. So the question that included the residual functional capacity that the ALJ ultimately found that Mr. Hutton had, the answer to that question was that the claimant could ultimately perform the work that the ALJ found at Step 5. So normally the ALJ will ask multiple questions of a vocational expert that have a various range of functional limitations attached to them. Some can be more severe. Some can be less, more restricting or less restricting, rather. But in this case, the ALJ asked one that had a very restrictive functional limitation, which ultimately the ALJ didn't find in his decision. And the answer to that question, the vocational expert said there was no work. But in answer to a question regarding the functional limitation that the ALJ actually found, the vocational expert answered that there was work that the claimant could perform. He basically found he wasn't impaired for psychological reasons. Correct? The ALJ found that the claimant's PTSD was not severe. Was not severe. It was slight. But it seems to me that if he discounted that answer, the first answer from V.E., then he's, the ALJ is thinking he's not impeded in a functional way because of psychological reasons. That's what he decided. Well, the ALJ ultimately found that there was some limitation based on all of his impairments, some mental limitation based on all of his impairments, that the claimant was limited to simple, repetitive, nonpublic work. Okay. But, all right. Can we go back to step two? Or, I don't know, wherever it fits in. The testimony of the wife. He says the wife, you know, the wife never mentioned he had any problems with sleeping, da-da-da-da-da-da, when in fact the wife did, right? She did say that he had problems with going out, with taking care of himself problems, problems with sleeping, nightmares, all that. And the ALJ seems to say, no, she didn't say any of that, when in fact she did. Well, I think what the ALJ did is looked at the totality of her statement. And what the ALJ did note is that the wife's statement said, noted that the claimant was capable, Mr. Hutton, was capable of performing activities that were beyond what he alleged that he could perform. And so. But didn't the ALJ said, she didn't say he had any problems, and she didn't say that he had trouble sleeping, when in fact she did say that? Well, I think, I mean, I think ultimately the question is. Did she, is there an error there? Did he say she didn't say anything about sleeping and those kinds of problems, when in fact she did say it? She did, she did make a statement. She did, there was one line in there that she said that he experiences nightmares. That is, that is true. However, the question then comes whether the claimant having nightmares affects his ability to perform work. No, it affects whether the ALJ forgot part of the testimony, and whether he got it wrong. Well, it. I mean, it's more than that. I mean, we're looking at a record where the ALJ says one thing, and it's incorrect. So the question is, is it so slight and tangential that it doesn't matter? When it seems to me sleeping and nightmares is all, is what PTSD is about. Well, that may be so, but I think if you look at the ALJ's decision as a whole, I think the ALJ, I mean, the heart of the issue is ALJ's credibility determination, and determining whether he, the ALJ believes that Mr. Hutton's claims of PTSD. I think the ALJ has a reasonable basis within the medical evidence for that determination, and the ALJ has a reasonable basis in the nonmedical evidence for finding that the claimant's PTSD doesn't cause functional, any functional limitations beyond what the ALJ found. Following up on what Judge Rustoni was talking about, if you take a look at page 11 of 14 of the decision, Dr. Mack notes that the claimant's PTSD is related to his medical condition. Indeed, the only discussion of any mental health issues are related to his alleged pain. Not one word is mentioned about any symptoms related to combat or special operations, as he claims elsewhere. This assessment about complaints of pain and no other mental health issues is consistent with his wife's assessment. It's not consistent with his wife's assessment at all. That's a misstatement of the facts. Is there any indication in the record that there was any basis for the ALJ not to believe the wife? You've talked about the credibility determination as to the petitioner, but is there any basis not to believe the wife? Well, I would say that the ALJ, in his decision, talks about the part of the wife's statement that appears to be contradictory. So although the- Did she ever say that he didn't have nightmares and didn't wake up at night? She didn't. What the ALJ noted is that she said that he was able to play the guitar, he was able to go to classes, he was able to teach a welding class. And if Mr. Hutton was so disabled by his PTSD symptoms that he was unable to perform work- She never denied that he had nightmares or woke up in the middle of the night and had difficulty sleeping. She said that and never denied it. There's no contradiction in that. That's true. She did say that he had nightmares. And sometimes he went to school only if she drove him. He was in pain with headaches every day. And because he goes to school one day, it doesn't necessarily mean he can go to school every day. Right? Well, that's true. But part of the ALJ's job is to, you know, look at the evidence and weigh the evidence beforehand. I wouldn't have a lot of problem if he had said, I read the wife's testimony, it's overstated, you know, it's inconsistent. Okay. Okay. So I would argue that the ALJ's decision is based on the medical record before the ALJ. There's substantial evidence in the medical record to support his findings. He reasonably gave weight to the physicians that he gave weight to. He reasonably found claimant that Mr. Hutton was not credible for his PTSD. What was the basis of the credibility determination against Mr. Hutton? I'm sorry. What was the basis of the credibility determination against Mr. Hutton? The ALJ found. Meaner or contradictions or what? The ALJ found that he made multiple inconsistent statements as to the basis for his PTSD. The ALJ looked through his military record. His military record didn't support his allegations of what caused his PTSD. Although I said earlier that he was in the Gulf War, that is not what he alleged. He actually alleged that he was on some top secret military missions. Jumping. What's that? I'm sorry? Jumping.  He was at the Balkans. Well, he was stationed in the Balkans. That is within his military record, but that's not what he alleges was the basis for his PTSD. He alleges that he was on secret military missions in Somalia to one doctor, in South America to another doctor, and he alleges that these were the things that caused him PTSD. However, in reviewing his military records, the ALJ found that there was no basis in those records for any of that. You know, the VA doctors found he had PTSD. I mean, it may be at some point, maybe he's a liar, maybe at some point he's just getting delusional because he's so depressed and messed up or on psychotropic drugs, but presumably these VA physicians would have known what battle or what military service he had, right? If somebody had asked him why. That's possible. However, the two doctors, Dr. Mack and Dr. Laba, provided no, they provided first checkbox forms for their opinions that he was disabled. Dr. Mack provided very few treatment records, which don't explain the basis for this PTSD. What I'm confused about is the ALJ is supposed to give great weight to the VA finding him 100% disability, which he can then disregard if he has good reasons. But if he's got big holes in the VA file and he has to give great weight to it, isn't he supposed to go back and find out what was going on? Well, the ALJ actually did that. The ALJ subpoenaed Mr. Hutton's military records. Right. But he didn't go back to the doctors. He tried to. And there is a notation in the record that there is no records from Dr. Laba. And so what the ALJ did with the record before him, he weighed the evidence. And he found that with Those records that he went back to Dr. Laba and said you have something else, that he went back to Dr. Mack and said you have something else? Yes. At the end of the hearing, the ALJ specifically mentioned that he would hold the record open in order to get more medical evidence. Yes. He would hold the record open. But then the way I read that, he was holding it open for the plaintiff to put something in, not that he was going to go do something. Well, what ultimately happened was that the claimant said that he was going to obtain those records. There was a discussion at the end of the hearing. The claimant said I will obtain those records. The ALJ said I can get them or you can get them. The claimant said that he would get them. That's the military records or the medical records? The military records and the VA records, I believe. Okay. Thank you. I think you've exhausted your time. I wish you would use two minutes for rebuttal. Well, I'll start with Ian first. With respect to the subpoenaed records, that in itself is a problem. He subpoenaed the record. At the end of the hearing, he left the record open for the plaintiff's attorney to, Mr. Hutton's attorney, to get any additional records that the VA might have, medical records. She went back and the VA certified that they had provided with all the records, except I think they did provide the information that Dr. Labia, you know, they provided the records that reflected that he had prescribed medication and was one of the treating providers. However, she did get certification that there were no additional records. Unbeknownst to Mr. Hutton's attorney, after the hearing was closed, after presumably all the evidence was in the record, the ALJ then requested, subpoenaed his actual military record, well, not the entire record, from I think 1993 to a certain other year, a portion of it, he received. He did not notify Mr. Hutton's attorney that he had requested it. He did not proffer it for comment. And the first time that she knew about the fact that this new evidence was being considered was when she read the decision. In addition, when she tried to get the underlying document from the Office of Hearings and Appeals, they had already forwarded the record to the Appeals Council, so it was no longer available to her. It's not all in the record. Yes, it is. What record would I look at to use? What record would you look at for this? In Ms. Dastanow's brief to the Appeals Council, and that would be in the index, that would be her brief to the Appeals Council, she indicated that she was not, she was never proffered these records, nor does the, nor does Appelli dispute that. It just never occurred. Thank you very much. All right. We're going to take a five-minute break. Thank you very much.
judges: Restani, Wallace, Bea